### IN THE UNITED STATES DISTRICT COURT
### FOR THE EASTERN DISTRICT OF PENNSYLVANIA

REPUBLICAN PARTY OF
PENNSYLVANIA, et al.,

|                   *Plaintiffs,*

     v.

PEDRO A. CORTÉS, in his capacity as
Secretary of the Commonwealth of
Pennsylvania,

|                   *Defendant.*

CIVIL ACTION
NO. 16-05524

**PAPPERT, J.**                                                    **November 3, 2016**

### MEMORANDUM

States have the power to regulate elections. The Pennsylvania Election Code, enacted in 1937, regulates the electoral process in the Commonwealth in numerous ways. This case focuses on one specific Election Code provision, Section 2687(b), which requires poll watchers to be qualified electors of the county in which they serve. In other words, voters appointed to serve as poll watchers can perform that function only within the county where they are registered to vote. The Republican Party of Pennsylvania and eight duly qualified registered electors residing in various counties within the Commonwealth (collectively "Plaintiffs") sued Secretary of the Commonwealth Pedro Cortés seeking to enjoin the enforcement of that geographic restriction.

Prior to 2004, Section 2687(b) required poll watchers to serve within a much narrower area—their election districts, or precincts. That year the Pennsylvania General Assembly amended the statute to allow poll watchers to work anywhere within their county, the current geographic boundary. Plaintiffs now want the Court to effectively amend the Election Code again and allow poll watchers to cross county lines and monitor voting anywhere in the

1

Commonwealth.  Indeed, there is a bill pending in the State House of Representatives which would do just that, though the bill has languished in that body since January of 2015 without making it to the House floor for a vote.  Plaintiffs seek an immediate preliminary and then permanent injunction which would "last until such time as the Legislature enacts remedial legislation" that cures Section 2687(b)'s alleged constitutional defects.  Specifically, Plaintiffs contend that the provision violates their Fourteenth Amendment due process and equal protection rights and their rights to free speech and association under the First Amendment.

Plaintiffs seek an extraordinary remedy.  Because they have unreasonably delayed in doing so, and because they cannot satisfy any of the requirements necessary for the grant of injunctive relief, the Court denies the motion.

## I.

The United States Constitution reserves to the states the power to regulate elections.  It instructs that "[t]he Times, Places and Manner of holding Elections for Senators and Representatives, shall be prescribed in each State by the Legislature thereof; but the Congress may at any time by Law make or alter such Regulations, except as to the Places of chusing Senators."  U.S. Const. art I, § 4.  The states have long exercised this authority, "enact[ing] comprehensive and sometimes complex election codes."  *Anderson v. Celebrezze*, 460 U.S. 780, 788 (1983).

In 1937, the Pennsylvania General Assembly crafted just such a comprehensive statutory scheme: the Pennsylvania Election Code.  Under Section 2687 of the Code, candidates may appoint two poll watchers to each election district in which they appear on the ballot.  25 P.S. § 2687(a).  Political parties and political bodies[1] may also appoint up to three poll watchers per

---

[1]    "Political body" and "political party" are separately defined.  *See* 25 P.S. § 2831.  Both entities nominate candidates; the distinction between "parties" and "bodies" is the number of votes their candidates received in prior

election district in which they have a candidate on the ballot. *Id.* Poll watchers are permitted inside polling places "from the time that the election officers meet prior to the opening of the polls . . . until the time that the counting of votes is complete and the district register and voting check list is locked and sealed." *Id.* § 2687(b). During voting, poll watchers may carry a list of voters, and can "challenge any person making application to vote and to require proof of his qualifications." *Id.* After voting is complete, poll watchers may remain in the polling place but outside the enclosed space where ballots are counted and voting machines are canvassed. *Id.*

Poll watchers are permitted to participate in these activities partly in order to help "guard the integrity of the vote." *Tiryak v. Jordan*, 472 F. Supp. 822, 824 (E.D. Pa. 1979); *see also* (Tr. of Prelim. Inj. Hr'g. ("Hr'g Tr."), at 39:9–13). They also serve a decidedly partisan interest—assisting their party or candidate to keep track of who has voted to aid in "get out the vote" efforts.[2] Perhaps recognizing that the authority granted to poll watchers enables them to serve this more partisan function, the Election Code provides for their compensation by the candidates or political parties. *See* 25 P.S. § 2687(c).

The creation and role of poll watchers is of course only one small part of the Election Code's regulatory framework. The Code also governs county boards of elections, district election officers, election districts, polling places, elector qualifications, party organization, the nomination process, ballot formats and quantities, the use of voting machines and other

---

general or municipal elections. If the candidates earned more than two percent of the votes, the entity is a "party"; if less, it is a "political body." *id.; see also Com. ex rel. MacElree v. Legree*, 609 A.2d 155, 156 n.1 (Pa. 1992).

[2]     At the preliminary injunction hearing, Jonathan Marks, Commissioner of the Commonwealth's Bureau of Commissions, Elections and Legislation, testified that in his experience, the "primary function" of poll watchers is "to check off a list of names of . . . voters that they expect will vote for their party of their candidate," and also noted that "if . . . it gets late in the afternoon and certain voters haven't show up, they may make calls [to targeted voters] or contact somebody to make calls on their behalf." (Hr'g Tr., at 39:1–9); *see also Cotz v. Mastroeni*, 476 F. Supp. 2d 332, 345 (S.D.N.Y. 2007) ("Traditionally, poll watchers have a list of all the registered voters and they keep track of those who voted.").

electronic voting systems, the general conduct of primaries and elections, absentee voting, and the tabulation of election returns. *See generally* 25 P.S. Ch.14.

Election procedures and processes are managed by each of the Commonwealth's sixty-seven counties. Each county has a board of elections, which oversees the conduct of all elections within the county. 25 P.S. § 2641(a). The county board of elections selects, fixes and at times alters the polling locations of new election districts. *Id.* § 2726. Individual counties are also tasked with the preservation of all ballots cast in that county, *id.* § 2649, and have the authority to investigate fraud and report irregularities or any other issues to the district attorney, *id.* § 2642. Counties are also free to utilize different voting systems, and presently ten different systems are in place across the Commonwealth. (Def.'s Ex. 2, ECF No. 19); *see also* (Hr'g Tr., at 73:21–22). Any political party or political body entitled to have watchers at any registration, primary or general election can also appoint watchers to represent the party at any public session of the county board of elections. *Id.* § 2650(a). Like poll watchers, those watchers must be qualified electors of the relevant county. *Id.* Decentralized control is also seen at the election district, or precinct, level. Each district has an election board which is composed of a judge of election and majority and minority inspectors of elections, *id.* § 2671, and each member of that board must be a qualified elector of the election district in which they serve, *id.* § 2672.

The Election Code contains numerous provisions designed to maintain and uphold the integrity of the vote. The Code provides for the appointment of "overseers of election" who carry greater authority than poll watchers. *Id.* § 2685. Section 2685 directs the Pennsylvania Courts of Common Pleas to appoint two election overseers from different political parties upon the petition of five or more "duly registered electors of any election district." *Id.* Election overseers have the right to be present with the officers of an election "within the enclosed space

during the entire time the primary or election is held." *Id.* Poll watchers have no such right— Section 2687(b) requires that poll watchers remain "outside the enclosed space" where ballots are counted or voting machines canvassed. *Id.* § 2687(b). Election overseers also have the authority "to challenge any person offering to vote and interrogate him and his witnesses under oath in regard to his right of suffrage." *Id.* § 2685. Poll watchers have no such authority— Section 2687(b) permits poll watchers to "challenge any person making application to vote and to require proof of his qualifications" but not to question a voter under oath. *See id.* § 2687. The Election Code also addresses situations in which overseers are impeded from discharging their duties: some or all of the votes polled in that election district may be rejected by a proper tribunal. *Id.* § 2686. So while poll watchers may help guard the integrity of the vote, they are not the Election Code's only, or even best, means of doing so.

## II.

Federal Rule of Civil Procedure 65 authorizes courts to issue preliminary injunctions. Fed. R. Civ. P. 65. Injunctive relief is "an extraordinary remedy," which the Court may grant only "upon a clear showing that the plaintiff is entitled to such relief." *Winter v. Nat. Res. Def. Ctr.*, 555 U.S. 7, 22 (2008) (citing *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997)). Those seeking a preliminary injunction must establish that they are: (1) likely to succeed on the merits; (2) likely to suffer irreparable harm in the absence of the preliminary injunction; (3) "that the balance of equities tips in [their] favor"; and (4) that an injunction is in the public interest. *Winter*, 555 U.S. at 20; *see also Ferring Pharms., Inc. v. Watson Pharms., Inc.*, 765 F.3d 205, 210 (3d Cir. 2014). The movant bears the burden of proving these elements, *Ferring Pharms.*, 765 F.3d at 210 (citing *Opticians Ass'n of Am. v. Indep. Opticians of Am.*, 920 F.2d 187, 192 (3d Cir. 1990)), and the "failure to establish any element renders a preliminary injunction

inappropriate." *Id.* (quoting *NutraSweet Co. v. Vit-Mar Enters., Inc.*, 176 F.3d 151, 153 (3d Cir. 1999)).

Although Plaintiffs need not prove their case with "airtight certainty," the moving party nevertheless "bears a heavy burden on a motion for a preliminary injunction." *Punnett v. Carter*, 621 F.2d 578, 588 (3d Cir. 1980).   Moreover, since the "primary purpose of a preliminary injunction is maintenance of the status quo," *Acierno v. New Castle Cty.*, 40 F.3d 645, 647 (3d Cir. 1994), "when the preliminary injunction is directed not merely at preserving the status quo but, as in this case, at providing mandatory relief, the burden on the moving party is particularly heavy," *Punnett*, 621 F.2d at 582.

### III.

### A.

As an initial matter and before addressing the four requirements necessary to obtain an injunction, Plaintiffs unreasonably delayed filing their Complaint and Motion, something which weighs decidedly against granting the extraordinary relief they seek.   The delay is particularly relevant where, as here, an election is looming.   *United States v. City of Philadelphia*, No. 06-4592, 2006 WL 3922115, at *2 (E.D. Pa. Nov. 7, 2006) (citing *Purcell v. Gonzalez*, 549 U.S. 1 (2006)).   "[U]nder certain circumstances, such as where an impending election is imminent and a State's election machinery is already in progress, equitable considerations might justify a court in withholding the granting of immediately effective relief . . . ."   *Reynolds v. Sims*, 377 U.S. 533, 585 (1964).

There is good reason to avoid last-minute intervention in a state's election process.   Any intervention at this point risks practical concerns including disruption, confusion or other unforeseen deleterious effects.   *See City of Philadelphia*, 2006 WL 3922115, at *2 (citing

6

*Purcell*, 549 U.S. at 5).  Comity between the state and federal governments also counsels against last-minute meddling.  Federal intervention at this late hour risks "a disruption in the state electoral process [which] is not to be taken lightly."  *Id.* (quoting *Page v. Bartels*, 248 F.3d 175, 195–96 (3d Cir. 2001)).  "This important equitable consideration goes to the heart of our notions of federalism."  *Id.* (quoting *Page*, 248 F.3d at 195–96).

The Sixth Circuit Court of Appeals reaffirmed these principles on the very day of the preliminary injunction hearing in this case.  In *Crookston v. Johnson*, No. 16-2490, 2016 WL 6311623, at *1, ___ F.3d ___ (6th Cir. Oct. 28, 2016), the plaintiff challenged Michigan's law that prohibits voters from photographing ballots.  *Id.* at *1.  He sued to enjoin the law on September 26, 2016, and the district court issued the injunction.  *Id.*  On appeal, the Sixth Circuit held that although the case raised "interesting [constitutional] issues," the district court's injunction was improper because it effectively altered Michigan's election laws just ten days before election day.  *Id.*  Plaintiffs' requested relief in this case would alter Pennsylvania's laws just five days before the election.

Plaintiffs waited until eighteen days before the election to bring this case.  They filed their Complaint and Motion late in the afternoon on Friday, October 21, 2016.  (ECF Nos. 1 & 2.)  The Court became aware of the filing when it was entered on the docket on Monday, October 24, 2016.  *See* (ECF No. 1).  The Court convened that day a telephone conference with counsel for the parties and ordered the Secretary to file his response by Wednesday, October 26.  (ECF Nos. 5–6.)  Less than two days after receiving the Secretary's response, the Court held the hearing on the preliminary injunction request.[3]  (ECF No. 19.)  The Court received the hearing transcript on Monday, October 31.  (ECF No. 20.)  Were the Court to enter the requested

---

[3]     While Plaintiffs initially requested both a preliminary injunction and a temporary restraining order ("TRO") (ECF No. 2), the Court's scheduling of a hearing on October 28 obviated the need for a TRO.

injunction, poll watchers would be allowed to roam the Commonwealth on election day for the first time in the Election Code's seventy-nine year history—giving the Commonwealth and county election officials all of five days' notice to prepare for the change.

There was no need for this judicial fire drill and Plaintiffs offer no reasonable explanation or justification for the harried process they created.  At the hearing, Plaintiffs explained that they were waiting for the General Assembly to pass House Bill 29, which would amend Section 2687(b) by requiring only that a poll watcher be a qualified registered elector in the Commonwealth of Pennsylvania.  *See* H.B. 29, 200th Gen. Assemb. Reg. Sess. (Pa. 2015); *see also* (Compl., Ex. B, ECF No. 1-1); (Hr'g Tr., at 143:1–21).  The bill was introduced in the House of Representatives in January 2015 and remains in committee.  *See* H.B. 29, 200th Gen. Assemb. Reg. Sess. (Pa. 2015).  Having suddenly lost faith in the legislative process, Plaintiffs ask the Court to assume the General Assembly's role and enact House Bill 29 by judicial fiat. Such action would be inappropriate for a number of reasons, not the least of which is that at this late hour courts should not disrupt an impending election "absent a powerful reason for doing so." *Crookston*, 2016 WL 6311623, at *2.  There is no such reason here.

**B.**

Plaintiffs contend that Section 2687(b) violates the Equal Protection and Due Process Clauses of the Fourteenth Amendment.  They argue that by limiting poll watchers to the county in which they are qualified electors, Section 2687(b) hampers poll watchers' fundamental right to vote.  (Pls.' Mem. Supp. of Mot. for TRO and Inj. ("Pls.' Mem."), at 8, ECF No. 2.)  Plaintiffs also claim that Section 2687(b) infringes on their rights to free speech and association under the First Amendment by narrowing the pool of potential watchers at any polling place to the county

level.  (Pls.' Mem., at 14–15.)  The Court now examines whether plaintiffs have established the required elements entitling them to injunctive relief.  *See supra* Part II.

**i.**

To show a likelihood of success, "on an application for preliminary injunction, the plaintiff need only prove a *prima facie* case, not a certainty that he or she will win."  *See, e.g.*, *Highmark, Inc. v. UPMC Health Plan, Inc.*, 276 F.3d 160, 173 (3d Cir. 2001) (citing 11A Charles Alan Wright, Arthur R. Miller, *Federal Practice and Procedure: Civil* § 2948.3 (3d ed. 1998)); *see also Punnett v. Carter*, 621 F.2d 578, 583 (3d Cir. 1980) ("It is not necessary that the moving party's right to a final decision after trial be wholly without doubt; rather the burden is on the party seeking relief to make a *prima facie* case showing a reasonable probability that it will prevail on the merits.").  The Third Circuit Court of Appeals has held that "[f]or our Court, a sufficient degree of success for a strong showing exists if there is 'a reasonable chance, or probability, of winning.'"  *In re Revel AC, Inc.*, 802 F.3d 558, 569 (3d Cir. 2015) (quoting *Singer Mgmt. Consultants, Inc. v. Milgram*, 650 F.3d 223, 229 (3d Cir. 2011)).

In an attempt to show a likelihood of success on the merits of their equal protection and due process claims, Plaintiffs assert that poll watchers "shine a light on polling place procedures to prevent the violation of election law," and "when unqualified electors are permitted to vote within a district, the legitimate votes of all qualified electors in that district are diluted and their fundamental right to vote is therefore violated."  (Pls.' Mem., at 9)  The crux of this argument is that if a qualified, registered voter casts a valid ballot in one county and a fraudulent ballot is cast for a different candidate in another county, the fraudulent ballot effectively negates the valid ballot, and the qualified, registered elector's vote is diluted.  *See* (*Id.*)

9

Plaintiffs correctly note that "a free and fair election requires ballot security."   (*Id.*) While this statement is uncontroversial, the Plaintiffs' preoccupation with the role of poll watchers to deter purported voter fraud disregards other aspects of the regulatory framework the Commonwealth designed to ensure ballot integrity and thus prevent vote dilution.   *See* (Compl. ¶¶ 21, 56); *see also supra* Part I.   Plaintiffs' concerns over potential voter fraud—whether perpetrated by putative electors or poll workers themselves—appear more effectively addressed by election overseers than poll watchers, to take just one example.   The overseers have greater authority to question voters, and may be within the closed space in which ballots are counted and machines are canvassed, while poll watchers can do neither of those things.   *Compare* 25 P.S. § 2865 (governing elections overseers), *with id.* § 2687 (governing poll watchers).

Vote dilution is certainly a viable equal protection theory in certain contexts.   Such claims can allege that a state has enacted a particular voting scheme as a purposeful device "to minimize or cancel out the voting potential of racial or ethnic minorities."   *See Miller v. Johnson*, 515 U.S. 900, 911 (1995) (internal quotations omitted).   The plaintiffs in *Reynolds v. Sims*, for example, used the theory of vote dilution to challenge a state's legislative apportionment scheme, which failed to take into account variances in population between legislative districts.   377 U.S. 533 (1964).   The Supreme Court agreed that the scheme resulted in vote dilution, as the "resulting discrimination against those individuals living in disfavored areas is easily demonstrable mathematically." *Id.* at 563.   The scheme therefore infringed on the plaintiffs' right to vote since "[t]wo, five, or 10 of them must vote before the effect of their voting is equivalent to that of their favored neighbor."   *Id.*   Plaintiffs here cannot claim that Section 2678(b) mathematically dilutes their votes; their vote-dilution theory is based on speculation that fraudulent voters may be casting ballots elsewhere in the Commonwealth and the unproven

assumption that these alleged instances of voter fraud would be prevented by the affected poll watchers were they not precluded from serving at those locations.[4]

Plaintiffs also argue that Section 2687(b) violates the Due Process and Equal Protection Clauses by "arbitrarily and unreasonably distinguish[ing] between voters within the same electoral district by allowing some, but not others, to serve as poll watchers." (Pls.' Mem., at 10.) They contend that Section 2687(b) therefore permits "some people, but not others, to exercise fundamental rights—especially the fundamental right to participate in the political process." (*Id.* at 11.) Plaintiffs argue in their briefing that the statute should therefore be subject to strict scrutiny[5] and argue in the alternative that the statute cannot withstand even rational-basis review. (*Id.*) Plaintiffs acknowledged at the preliminary injunction hearing, however, that Section 2687(b) should be subject to a rational basis review and accordingly focused their arguments on that standard. (Hr'g Tr., at 12:5–14.)

Voting is a fundamental right. *Reynolds*, 377 U.S. at 554 ("It has been repeatedly recognized that all qualified voters have a constitutionally protected right to vote . . . ."). States' regulations on the times, places and manner of elections must therefore comport with equal protection and all other constitutional requirements. States retain considerable discretion to regulate elections, however. After all, the state "must play an active role in structuring

---

[4]      "In determining whether a law is facially invalid, [courts] must be careful not to go beyond the statute's facial requirements and speculate about 'hypothetical' or 'imaginary' cases." *Wash. State Grange v. Wash. State Republican Party*, 552 U.S. 442, 454 (2008). The Supreme Court has made clear that perceived threats to constitutional rights based on speculative contentions unsupported by record evidence cannot satisfy the "heavy burden of persuasion" required to prevail on a facial challenge. *Crawford v. Marion Cty. Election Bd.*, 553 U.S. 181, 200 (2008); *see also Wash. State Grange*, 552 U.S. at 454 (rejecting facial challenge to constitutionality of state election law because plaintiffs' theory depended not on the law's facial requirements but on sheer speculation that the law would cause voter confusion and there was no evidentiary record against which to assess their assertions that voters would in fact be confused).

Here, Plaintiffs' facial challenge to 2867(b)'s constitutionality depends, in part, on a vote dilution theory that is far more speculative than the assertion about voter confusion made in *Washington State Grange*. Because there is no support in the record for Plaintiffs' theory, it is not an appropriate basis for a facial challenge.

[5]      Election regulations subject to strict scrutiny are upheld only if they are "narrowly tailored to serve a compelling state interest." *Washington State Grange v. Wash. State Republican Party*, 552 U.S. 442, 451 (2008).

elections . . . if they are to be fair and honest and if some sort of order, rather than chaos, is to accompany the democratic process." *Burdick v. Takushi*, 504 U.S. 428, 433 (1992) (quoting *Storer v. Brown*, 415 U.S. 724, 730 (1974)).

Every regulation on elections will "invariably impose some burden upon individual voters." *Id.* at 433 (quoting *Anderson*, 460 U.S. at 788). Not every such burden, however, is subject to strict scrutiny. *Id.*; *see also Anderson*, 460 U.S. at 788 ("Although the[ ] rights of voters are fundamental, not all restrictions imposed by the States . . . impose constitutionally-suspect burdens on voters' rights to associate or to choose among candidates."). Rather, strict scrutiny is typically reserved for regulations that involve a suspect classification (such as race, alienage or national origin) or actually infringe on a fundamental right. *Donatelli v. Mitchell*, 2 F.3d 508, 513 (3d Cir. 1993); *see also Burdick*, 504 U.S. at 434 (reserving strict scrutiny for state regulations that impose a severe burden on a plaintiff's right to vote). As the Supreme Court clarified in *Anderson* and *Burdick*, a state regulation that imposes only reasonable, nondiscriminatory burdens on the election process will be subject to an intermediate form of scrutiny. *Burdick,* 504 U.S. at 428 (quoting *Anderson*, 460 U.S. at 788). In that situation, a court must determine whether the state's interests outweigh any burden imposed on a plaintiff's Fourteenth Amendment rights. *Id.* at 434.

Where the right to vote is not burdened by a state's regulation on the election process, however, the state need only provide a rational basis for the statute. *See Donatelli*, 2 F.3d at 514 & n.10 (declining to apply *Anderson* or *Burdick*'s intermediate standards because the plaintiffs' fundamental rights were not burdened by state law); *see also Voting for Am., Inc. v. Andrade*, 488 F. App'x 890, 899 (5th Cir. 2012) (applying rational basis review as opposed to the *Anderson–Burdick* balancing test because state election law did not implicate or burden specific

constitutional rights); *Molinari v. Bloomberg*, 564 F.3d 587, 602 (2d Cir. 2009) (same); *McLaughlin v. N. Carolina Bd. of Elections*, 65 F.3d 1215, 1227 (4th Cir. 1995) (noting that a state election law can only fail the *Anderson–Burdick* balancing test if it in fact burdens protected rights).

Plaintiffs have not shown that Section 2687(b) burdens their fundamental right to vote or in any way limits their range of choices in the voting booth. The individual voters who bring this case along with the Republican Party are not hindered in their exercise of the franchise: unlike the plaintiff in *Burdick,* where the State of Hawaii banned write-in voting, *Burdick*, 504 U.S. at 430, Plaintiffs here may cast ballots for whomever they wish; they are also free to serve as poll watchers in the counties in which they are qualified electors if appointed by the party or a candidate. Indeed the Plaintiffs acknowledge that there is no individual constitutional right to serve as a poll watcher, (Hr'g Tr. 175:17–176:1), but rather the right is conferred by statute. Under that statutory right, an individual may serve as a poll watcher only if appointed to do so by a candidate or the party—unaffiliated individuals with concerns over ballot integrity are not authorized to monitor the polls uninvited. *See* 25 P.S. § 2687(a). The Republican Party is similarly unable to demonstrate a burden on its rights to equal protection and due process—it points to no polling place that Section 2687(b) prevents it from staffing with poll watchers.

Because Section 2687(b) places no burden on Plaintiffs' constitutional rights, the statute need only withstand rational-basis review. Statutes evaluated for a rational basis are "accorded a strong presumption of validity." *Donatelli*, 2 F.3d at 515 (quoting *Heller v. Doe by Doe*, 509 U.S. 312, 319 (1993)). "[A] statutory classification that neither proceeds along suspect lines nor infringes fundamental constitutional rights must be upheld against equal protection challenge if there is any reasonably conceivable state of facts that could provide a rational basis for the

classification." *FCC v. Beach Commc'ns*, 508 U.S. 307, 313 (1993).  In engaging in a rational-basis review, the Court has no license "to judge the wisdom, fairness, or logic of legislative choices." *Id.*

There is a rational basis for Section 2687(b)'s requirement that poll watchers be qualified electors in the county in which they work.  The Secretary notes that in 1937, the General Assembly enacted a county-based scheme to manage elections within the state, and consistent with that scheme the legislature endeavored to allow county election officials to oversee a manageable portion of the state in all aspects of the process, including in credentialing poll watchers.  (Hr'g Tr., at 197:12–198:17, 200:3–4.)  In short, Pennsylvania opted to design a county-by-county system of elections; in doing so it ensured as much coherency in this patchwork system as possible.  To that end it ensured that participants in the election—voters and watchers alike—were qualified electors in the relevant county.  *See* (*id*).  The legislature's decision to allow county election officials to credential only poll watchers from their own county is rationally related to the state's interest in maintaining its county-run election system; each county election official is tasked with managing credentials for a discrete part of the state's population.  As the Secretary's counsel noted at the hearing, the legislature chose to "draw the lines" at the county level, something entirely rational in fashioning a scheme for a state as large as Pennsylvania.  *See* (*id.* at 200:6–19).  Even if allowing poll watchers to serve anywhere in Pennsylvania imposed minimal or negligible additional burdens on the Commonwealth and the counties, *see* (*id.* at 211:9–17), that does not render the legislature's original policy decision irrational or illegitimate.[6]  Section 2687(b) imposes no burden on Plaintiffs' fundamental rights, and there is a sufficient rational basis for its residency requirement.

---

[6]       Even if the Plaintiffs could show that Section 2687(b) somehow burdened their fundamental right to vote, the Secretary would need only demonstrate that the Commonwealth's "important regulatory interest" is "sufficient

14

**ii.**

Plaintiffs also have not shown that they are likely to suffer irreparable harm should the Court not issue the preliminary injunction.  To do so, Plaintiffs "must demonstrate potential harm which cannot be redressed by a legal or an equitable remedy following a trial.  The preliminary injunction must be the only way of protecting the plaintiff from harm."  *Campbell Soup Co. v. ConAgra, Inc.*, 977 F.2d 86, 91 (3d Cir. 1992) (citations omitted).  "Establishing a risk of irreparable harm is not enough.  A plaintiff has the burden of proving a 'clear showing of immediate irreparable injury.'"  *ECRI v. McGraw-Hill, Inc.*, 809 F.2d 223, 226 (3d Cir. 1987) (citations omitted).  "The requisite feared injury or harm must be irreparable—not merely serious or substantial, and it must be of a peculiar nature, so that compensation in money cannot atone for it."  *Id.*

Plaintiffs first claim that irreparable harm is presumed whenever a constitutional violation is asserted.  They fail to demonstrate a likelihood of success on the merits, however, which undermines their argument that the asserted harm is automatically irreparable.  *See supra* subsection III.B.i.  Without some showing of a recognizable *legal* harm, the Plaintiffs cannot demonstrate irreparable harm.  Plaintiffs' timing also works against them here, as the emergent nature of this suit is the Plaintiffs' own doing.  *Cf. Colón-Merrero v. Conty-Pérez*, 703 F.3d 134, 139 (1st Cir. 2012) (finding that a plaintiff's "claims of irreparable harm were undermined by the fact that their emergency was largely of their own making when the plaintiff "sought to challenge long-standing election laws in the weeks leading up to an election" (internal quotations omitted)).

---

to justify reasonable, nondiscriminatory restrictions" in order for Section 2687(b) to survive an equal protection challenge. *Timmons v. Twin Cities Area New Party*, 520 U.S. 351, 358 (1997) (citing *Burdick*, 504 U.S. at 434).

Plaintiffs also assert that denying an injunction "could have a determinative effect on the election." (Pls.' Mot., at 16.) This highly speculative concern is insufficient to warrant the extraordinary remedy of a preliminary injunction. *See McGraw-Hill*, 809 F.2d at 226 ("Establishing a risk of irreparable harm is not enough. A plaintiff has the burden of proving a 'clear showing of immediate irreparable injury.'"). Furthermore, although the Republican Party alleges that Section 2687(b) prevents it from staffing every election district in the state with credentialed poll watchers, (Compl. ¶ 74), it offers no evidence to show that Section 2687(b) is responsible for their purported staffing woes. Rather, as the Secretary demonstrated at the hearing, the Party could staff the entirety of the poll watcher allotment in Philadelphia county with just 4.1% of the registered Republicans in the county. (Hr'g Tr., at 54:6–9; Def.'s Ex. 1.) Section 2687(b) in no way bars the Party from staffing every election district with the allotted number of poll watchers. An injunction, therefore, is not "the only way of protecting [them] from harm." *Campbell Soup Co.*, 977 F.2d at 91.

The harm to the registered-elector Plaintiffs is also unclear. They assert that they are injured by being limited to poll watching in their own county, even when votes outside of their county impact elections they are interested in. Only one witness testified for the Plaintiffs at the hearing—Ralph Wike III, one of the registered electors who filed the lawsuit. Mr. Wike testified that he is a registered voter in Delaware County, (Hr'g Tr., at 23:22–24:1), and that he has served as a poll watcher in that county before, (*id.* at 25:24–26:6). Mr. Wike further testified that he would sign up to serve as a poll watcher in a county other than his own, but is not permitted to do so under current law. (*Id.* at 24:10–18.) Mr. Wike was the Plaintiffs' only effort at establishing irreparable harm—ostensibly on the theory that once the election passes his inability to serve as a poll watcher outside his home county cannot be undone. (*Id.* at 173:5–10.) Given the

16

extraordinary nature of injunctive relief and the accompanying "heavy burden on a motion for a preliminary injunction" on the Plaintiffs, *Punnett*, 621 F.2d at 588, that showing is insufficient, for a host of reasons, to demonstrate irreparable harm.

**iii.**

The balance of equities also disfavors an injunction.  To evaluate this element, the Court must weigh "the potential injury to the plaintiff if an injunction does not issue versus the potential injury to the defendant if the injunction is issued."  *Novartis Consumer Health, Inc. v. Johnson & Johnson–Merck Consumer*, 290 F.3d 578, 596 (3d Cir. 2002).  Plaintiffs allege that Section 2687(b) limits their ability to fully staff polling places in certain counties in Pennsylvania.  (Pls.' Mem., at 15.)  However, they point to no polling place that Section 2687(b) bars them from staffing with poll watchers.  Similarly, the registered-elector Plaintiffs remain free to watch the polls in their home counties if appointed to do so by a candidate or party.

The Commonwealth, meanwhile, will be harmed if the Court enjoins one of its duly enacted laws.  *See Maryland v. King*, 133 S. Ct. 1, 3 (2012) ("Any time a State is enjoined by a court from effectuating statutes enacted by representatives of its people, it suffers a form of irreparable injury." (quoting *New Motor Vehicle Bd. of Cal. v. Orrin W. Fox Co.*, 434 U.S. 1345, 1351 (1977)).  At the hearing, the Secretary produced two witnesses to demonstrate potential burden on counties and the Commonwealth if the Court issues an injunction.  Jonathan Marks, Commissioner of the Bureau of Commissions, Elections and Legislation testified that the Commonwealth is currently engaged in "a number of election-related duties, including the statewide voter registry, campaign finance reporting, as well as general election administration matters."[7]  (Hr'g Tr., at 35:3–36:14, 37:1–4.)  The Commonwealth is also responsible for

---

[7]    The State manages the statewide voter registry through the "SURE" system.  "SURE" is an acronym for "Statewide Uniform Registry of Electors."  25 P.S. § 1222(a).  The SURE system contains a database of all

tracking absentee ballots that are processed at the county level and more generally tracking the workflow of the counties.  (*Id.* at 56:16–23.)

Commissioner Marks also explained that county election officials are currently working to ensure that absentee ballots are processed and logged.  He estimated that as of the time of the hearing, there were roughly 100,000 outstanding absentee ballots that would be returned to county election officials across the Commonwealth.  *See* (*id.* at 57:1–17; 70:7–11).  Commissioner Marks also noted that county election officials are working to ensure that polling places have the necessary documents and supplies, (*id.* at 70:11–16), that poll workers are trained, (*id.* at 70:17–19), and, of course, that poll watchers are properly credentialed.  The counties must also field inquiries from voters regarding the status of absentee ballots and the location of polling places, among other things.  (*Id.* at 70:21–71:3.)

Debbie Olivieri, the Berks County Elections Director, also testified at the hearing.  Ms. Olivieri is currently overseeing the delivery of voting machines, (*id.* at 117:14–15), and the printing of poll books, (*id.* at 117:16–17).  Most pressing, Ms. Olivieri has "thousands of absentee ballots coming in and being delivered."  (*Id.* at 117:18–19.)  Any additional, unforeseen work will require prioritization; as Ms. Olivieri testified, "[t]he closer we get to an election, the less time I'm going to have to prepare numerous . . . watcher certificates." (*Id.* at 116:5–7.)

Allowing poll watchers to work in any county in the Commonwealth could result in certain counties being inundated with prospective poll watchers seeking credentials.  Ms. Olivieri stated that any influx of potential poll watchers at this time would impact the workflow and other duties she and her staff of eleven workers must accomplish.  (*Id.* at 116:14–117:2.)  She testified that she and her staff are already "exhausted" from their election-related duties, (*id.* at 116:9–12,

---

registered electors in the Commonwealth and is maintained electronically by the Commonwealth; *id.* § 1222(a)–(b), the system allows counties and the Commonwealth to search for voter registration information and to identify duplicate information, *id.* § 1222(c).

121:3–5), and if several hundred or thousand prospective poll watchers sought certification this late, she "would have a hard time accomplishing that" and "it would create an issue in trying to get them all done with the rest of the workload that [she has]," (*id.* 134:16–21, 135:1–3).

At the hearing, Plaintiffs noted that such an influx could theoretically occur under Section 2687(b) today, because the total number of poll watcher positions that parties and candidates are permitted to fill is the same with or without Section 2687(b)'s county-elector requirement. *See* (*id.* at 122:16–25, 131:13–132:23). While technically true, such an occurrence would be highly unlikely as a practical matter for two reasons. First, many counties prearrange with the parties and candidates to start the credentialing process early. (*Id.* at 115:23–116:5.) Second, counties would be inundated with requests to credential poll watchers under Section 2687(b) as it stands if the political parties or candidates were able to fill those positions with qualified electors from those counties—an unlikely scenario, given the Plaintiffs' contention that they are unable to do so. *See* (Compl. ¶¶ 73–74); *see also* (Hr'g Tr., at 179:14–18).

Ms. Olivieri's testimony foreshadows a more likely problem, though one the Plaintiffs did not acknowledge, much less address. Plaintiffs' counsel was reticent to admit the extent to which suspected voter fraud in Philadelphia motivates their request for an injunction. *See* (Hr'g Tr., at 162:16–163:17.)   In their Complaint, however, Plaintiffs cite the Republican Party's "interest in having its poll watchers monitor the polls within Philadelphia County to ensure the integrity of the vote." (Compl. ¶ 47.) Plaintiffs repeat this concern in the brief supporting their Motion. (Pls.' Mem., at 17.) To the extent that the Party wishes to allocate newly available poll watchers on election day, it will of course send them to Philadelphia. The poll watchers will all need to be properly credentialed in Philadelphia County and they will all seek those credentials between now and election day. With 1,686 election districts in Philadelphia County, the

Republican Party alone, not counting any individual candidates, is allotted 5,085 poll watcher positions.[8] Philadelphia County election officials would have just five days to credential any of those positions that are as-yet unfilled.

While it is therefore very unlikely that the counties will be burdened by large numbers of potential poll watchers absent an injunction, it is much more likely that such a burdensome influx would result if an injunction were issued. As county workers focus on myriad critical tasks in the final days before the election, an injunction's likely effect of increasing their workload (perhaps to the point of impossibility) weighs strongly against granting it. *See* (Hr'g Tr., at 116:14–117:21, 134:10–136:3).

### iv.

Granting the preliminary injunction would not be in the public interest. Particularly in cases "involving important public issues which implicate significant policy considerations, it is appropriate that the trial judge consider possible harm to other interested parties and the public interest in deciding whether to issue the preliminary injunction." *Punnett*, 621 F.2d at 587. There is surely a strong public interest in the efficient and consistent application of the Commonwealth's election laws. *Cf. Summit Cty. Dem. Cent. & Exec. Comm. v. Blackwell*, 388 F.3d 547, 551 (6th Cir. 2004) ("[T]here is a strong public interest in smooth and effective administration of the voting laws that militates against changing the rules in the hours immediately preceding the election."). This is particularly so when, as here, any potential change will go into effect when county election officials and the Secretary are working to ensure that the necessary systems are in place for the election. At the hearing, Commissioner Marks

---

[8]       The Court arrived at this number by multiplying the 1,686 election districts in Philadelphia, *see* (Hr'g Tr., at 178:17), by the three poll watchers the Party may appoint, *see* 25 P.S. § 2687(a).

noted that the Commonwealth is responsible for managing the statewide voter registry, campaign finance reporting, and "general election administration matters." (Hr'g Tr., at 36:24–37:4.)

The *Winter* factors counsel against issuing a preliminary injunction. Plaintiffs have not demonstrated a likelihood of success on the merits, nor have they demonstrated irreparable harm, that the balance of harms tips in their favor or that the public interest favors an injunction.

### C.

Plaintiffs also argue that Section 2687 violates the Republican Party's freedom of association and both the Party and the registered-elector Plaintiffs' freedom of speech guaranteed by the First Amendment. Plaintiffs contend that poll watching "constitutes free association with candidates, political parties, and political bodies" since poll watchers are representatives of their parties. (Compl. ¶¶ 79–80.) Plaintiffs further assert that poll watchers engage in core political speech and, in their capacity as representatives selected by the parties, exercise the Party's freedom of speech as well. More specifically, Plaintiffs contend that a "poll watcher (or an individual who would serve as a poll watcher but for the residency requirement), engages in protected speech by, *inter alia*, reporting incidents of potential violations of the Election Code (or other regulations or criminal statutes) during the conduct of an election." (Pls.' Mot., at 14.) Plaintiffs conclude that by limiting poll watchers to the county in which they are qualified electors, Section 2687(b) "totally restricts this form of political speech and free association for both poll watchers and the political parties they represent," and therefore should be subject to strict scrutiny, under which it fails to for lack of a compelling government interest." (Compl. ¶¶ 80–81.) The Court now assesses Plaintiffs' ability to satisfy the four prerequisites to injunctive relief with respect to these First Amendment claims.

**i.**

The First Amendment instructs "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof; or abridging the freedom of speech, or of the press; or the right of the people peaceably to assemble."  U.S. Const. amend. I.  The Amendment is applicable to the states through the Fourteenth Amendment.  *Bigelow v. Virginia*, 421 U.S. 809, 811 (1975) (citing *Schneider v. State*, 308 U.S. 147, 160 (1939)).  Accordingly, "[a] State's broad power to regulate the time, place, and manner of elections 'does not extinguish the State's responsibility to observe the limits established by the First Amendment rights of the State's citizens.'"  *Eu v. San Francisco Cty. Democratic Cent. Comm.*, 489 U.S. 214, 222 (1989) (quoting *Tashjian v. Republican Party of Conn.*, 479 U.S. 208, 217 (1986)).

Plaintiffs do not cite any authority for the proposition that "poll watching" is a fundamental right under the First Amendment, and the Court has found no support for such a proposition.  To the contrary, other courts have found that "poll watching is not incidental to" the right of free association and it therefore "has no distinct First Amendment protection."  *Cotz v. Mastroeni*, 476 F. Supp. 2d 332, 364 (S.D.N.Y. 2007); *see also Dailey v. Hands*, No. 14-00423, 2015 WL 1293188, at *5 (S.D. Ala. Mar. 23, 2015) ("[P]oll watching is not a fundamental right protected by the First Amendment.").  In *Turner v. Cooper*, 583 F. Supp. 1160, 1162 (N.D. Ill. 2011), for example, the plaintiff argued that her status as a poll watcher was "incident" to her First Amendment right to political association with the campaign of her preferred candidate.  The court agreed that political association is one of the freedoms the First Amendment seeks to protect, but rejected the plaintiff's assertion that restrictions on her ability to be a poll watcher infringed on this freedom, stating that "[p]laintiffs have cited no authority, however, nor have we

found any, that supports the proposition that [the plaintiff] had a first amendment right to act as a pollwatcher." *Id.*

State law, not the Federal Constitution, grants individuals the ability to serve as poll watchers and parties and candidates the authority to select those individuals. *See* 25 P.S. § 2687(a); *see also Turner*, 583 F. Supp. at 1162 ("[W]e would suggest that the state is not constitutionally required to permit poll watchers for political parties and candidates to observe the conduct of elections. Illinois has chosen to do so, but [plaintiff's] right to be present at the polling place derive[s] solely from state law."). Indeed, while poll watchers are nearly ubiquitous, they are not universal; *cf.* W. Va. Code 3-1-37, *et. seq.*, and are absent from much of our history. Because the Pennsylvania Election Code, not the United States Constitution, grants parties the ability to appoint poll watchers, the state is free to regulate their use and its decision to do so does not implicate or impair any protected associational rights.[9]

At the hearing, Plaintiffs also acknowledged that they could not cite any case law to support their position that speech engaged in while poll watching constitutes core political speech, and admitted that this was "not [their] strongest argument." (Hr'g Tr., at 187:18–20, 189:22–23.) They are correct in this regard. Political speech is "central to the meaning and purpose of the First Amendment." *Citizens United v. Fed. Election Comm'n*, 558 U.S. 310, 329 (2010). Core political speech is "interactive communication concerning political change," *Meyer v. Grant*, 486 U.S. 414, 422 (1988), and includes, among other things, "speech uttered during a campaign for political office," *Eu*, 489 U.S. at 223, "discussion of public issues and

---

[9]      Even if the state's restriction was deemed to implicate the poll watchers' or Party's private associational rights under the First Amendment, the Court would perform the same analysis under *Burdick* and *Timmons*, *supra* subsection III.B.i, at 10–12, under which Plaintiffs were found unlikely to succeed on the merits. *See Timmons*, 520 U.S. at 357 ("When deciding whether a state election law violates First and Fourteenth Amendment associational rights, we weigh the 'character and magnitude' of the burden the State's rule imposes on those rights against the interests the State contends justify that burden, and consider the extent to which the State's concerns make the burden necessary." (citing *Burdick*, 504 U.S. at 434)).

debate on the qualifications of candidates," *Buckley v. Valeo*, 424 U.S. 1, 14 (1976), "advocacy of political reform," *Meyer*, 486 U.S. at 422, "handing out leaflets in the advocacy of a politically controversial viewpoint," *McIntyre v. Ohio Elections Comm'n*, 514 U.S. 334, 355 (1995), "persuasive speech seeking support for particular causes or for particular views on economic, political, or social issues," *Schaumburg v. Citizens for a Better Env't*, 444 U.S. 620, 632 (1980), and speech designed to influence referendum issues, *First Nat'l Bank of Bos. v. Bellotti*, 435, 776–77 (1978).  Such political expressions are crucial to self-government and are afforded broad protection in order to safeguard "the ability of the citizenry to make informed choices among candidates for office" and "assure [the] unfettered interchange of ideas for the bringing about of political and social changes desired by the people." *Roth v. United States*, 354 U.S. 476, 484 (1957).

Viewed through this lens, Plaintiffs' assertion that statements made in one's capacity as a poll watcher constitute core political speech is meritless.  First of all, the content of a poll watcher's statements cannot be characterized as political speech.  When a poll watcher reports incidents of potential violations of the Election Code during the conduct of an election, he neither facilitates public discussion of a political issue nor advocates for a particular candidate, issue or viewpoint.  Rather, as the Secretary's counsel noted at the hearing, poll watchers are not allowed "to advocate or talk political speech to the voters as they're coming in" or "wear garb." (Hr'g Tr., at 208:11–15.)  Plaintiffs claimed at the hearing that the speech engaged in by poll watchers is comparable to the speech engaged in by private citizens who circulate nominating petitions to garner support for a candidate and obtain the requisite number of signatures to place the candidate on the ballot.  (Hr'g Tr., at 190:1–24.)  Accordingly, the Commonwealth's requirement that poll watchers be qualified electors in the county in which they serve is "very

analogous," (*id.* at 190:3), to the its prior requirement, struck down as unconstitutional in *Morrill v. Weaver*, 224 F. Supp. 2d 882 (E.D. Pa. 2002), that circulators of nominating petitions be residents of the political district to which the signatures pertain.

The *Morrill* court, analyzing that requirement under strict scrutiny, invalidated it because circulating petitions constituted core political speech under Supreme Court precedent. *Id.* (citing *Buckley v. Am. Constitutional Law Found., Inc.*, 525 U.S. 182, 186 (1999)). In *Buckley*, the Supreme Court declared unconstitutional a state requirement that a petition circulator be a registered voter. Its decision hinged on the determination that petition circulating is core political speech because it involves "interactive communication concerning political change." 525 U.S. at 186 (quoting *Meyer*, 486 U.S. at 422). The Court further explained that because the circulator must endeavor to persuade electors to sign the petition, the endeavor "of necessity involves both the expression of a desire for political change and a discussion of the merits of the proposed change." *Id.* at 200 (quoting *Meyer*, 486 U.S. at 421). Plaintiffs' analogy therefore falls short; unlike petition circulators, poll watchers do not discuss or advocate for a political candidate or viewpoint, either explicitly or implicitly.

When a poll watcher reports incidents of violations, he is performing a public function delegated by the state. *See Tiryak*, 472 F. Supp. at 824. "No activity is more indelibly a public function that the holding of a political election." *Id.* "While the Constitution protects private rights of association and advocacy with regard to the election of public officials, [Supreme Court] cases make it clear that the conduct of the elections themselves is an [e]xclusively public function." *Flagg Bros., Inc. v. Brooks*, 436 U.S. 149, 158 (1978). Although a poll watcher may be motivated to serve in such a capacity to guard the interests of a particular candidate or party, "[p]rotecting the purity of the electoral process is a state responsibility and the poll-watcher's

25

statutory role in providing that protection involves him in a public activity, regardless of his private political motive." *Tiryak*, 472 F. Supp. at 824.

Regardless of the poll watcher's motivations for serving—either his private interests or those of his party—he is only empowered to do so because of the Election Code, and when he reports possible violations of that law, he is performing a state function. *See id.* The Commonwealth's restriction on the county in which poll watchers are able to make such statements does not implicate their private rights of association or advocacy.[10]

### ii.

Likewise, Plaintiffs have failed to demonstrate irreparable harm. The Third Circuit has clarified that "the assertion of First Amendment rights does not automatically require a finding of irreparable injury, thus entitling a plaintiff to a preliminary injunction if he shows a likelihood of success on the merits." *Hohe v. Casey*, 868 F.2d 69, 72–73 (3d Cir. 1989), *cert. denied*, 493 U.S. 848 (1989). Rather, a plaintiff must show a chilling effect on free expression or a real or immediate threat to their rights in the near future. *See Conchatta, Inc. v. Evanko*, 83 F. App'x 437, 440 (3d Cir. 2003) (citing *Hohe*, 868 F.2d at 72; *Anderson v. Davila*, 125 F.3d 148, 164 (3d Cir. 1997)). Because the Plaintiffs are highly unlikely to succeed in showing a violation of their First Amendment rights, they have not shown a likely threat of irreparable harm.

### iii.–iv.

The remaining two factors—the balance of equities and the public interest—likewise weigh against the granting of the preliminary injunction for the same reasons discussed above, *supra* subsections III.B.iii–iv.

---

[10]     Even if Section 2687(b) implicated the poll watchers' or the Party's private rights to freedom of speech, it would likely survive under the reasonableness analysis applied to content-neutral restrictions on speech in non-public fora. *See PG Publ'g Co. v. Aichele*, 705 F.3d 91, 113 (3d Cir. 2013) ("[A] polling place is a nonpublic forum, requiring the government to satisfy only a reasonableness analysis.").

**D.**

Plaintiffs also contend that Section 2687(b)'s residency requirement violates the Pennsylvania Constitution for the same reasons it violates the Federal Constitution. (*Id.* ¶ 85.) The Secretary argues that Plaintiffs' claims under the Pennsylvania Constitution are barred by the Eleventh Amendment under the Supreme Court's decision in *Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89 (1984). In that case, the Court held that a federal suit against state officials on the basis of state law contravenes the Eleventh Amendment when the relief sought and ordered has an impact directly on the State itself. *Id.* at 103. At the hearing, Plaintiffs, citing *Ex Parte Young*, 209 U.S. 123 (1908), responded that their claims were not barred under *Pennhurst* as they seek only injunctive relief. (Hr'g Tr., at 141:15–23.) *Ex Parte Young* held that the Eleventh Amendment does not preclude suits against state officials for injunctive relief, even when the remedy will enjoin the implementation of an official state policy. *See Young*, 209 U.S. 123. However, the Supreme Court stated that "[i]n making an officer of the state a party defendant in a suit to enjoin the enforcement of an act alleged to be unconstitutional, it is plain that such officer must have some connection with the enforcement of the act, or else it is merely making him a party as a representative of the state, and thereby attempting to make the state a party." *Id.* at 157. Secretary Cortés contends that he has no authority over the credentialing process or county officials' decisions to grant or deny poll watcher status to particular potential poll watchers. (Def.'s Brief in Opp'n, at 9.)

The Court need not address these arguments in any greater detail. Assuming, *arguendo*, that Secretary Cortés, as the Commonwealth's Chief Election Official, has sufficient connection with the enforcement of Section 2687(b) to permit Plaintiffs' claims under the Pennsylvania Constitution to proceed, Plaintiffs' state claims do not entail any new arguments and do not alter

the federal constitutional analysis in any way. As Plaintiffs acknowledge in their motion, Pennsylvania's equal protection and due process provisions are coextensive with the corresponding provisions of the United States Constitution. *See Com., Dep't of Transp. v. Taylor*, 841 A.2d 108, 114 n.6 (Pa. 2004); *Driscoll v. Corbett*, 69 A.3d 197, 209 (Pa. 2013); *Erfer v. Com.*, 794 A.2d 325, 332 (Pa. 2002). Likewise, Plaintiffs assert that the Pennsylvania Constitution guarantees at least the same level of free speech protection as the Federal Constitution but neither allege nor cite any authority to suggest that the Pennsylvania Constitution offers greater protection. The Court's analysis of Plaintiffs' entitlement to an injunction under the United States Constitution applies to their state constitutional arguments as well.

BY THE COURT:

*/s/ Gerald J. Pappert*
GERALD J. PAPPERT, J.